UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRINET USA, INC.,

    Plaintiff,
v.                               Case No. 8:20-cv-2018-VMC-AAS

VENSURE EMPLOYER SERVICES,
INC.,

    Defendant.
_____/

**ORDER**

This matter comes before the Court upon consideration of Defendant Vensure Employer Services, Inc.'s Motion to Dismiss Second Amended Complaint (Doc. # 65), filed on April 8, 2021. Plaintiff TriNet USA, Inc., responded on April 27, 2021. (Doc. # 74). For the reasons below, the Motion is denied.

**I.    Background**

This case arose out of Vensure's alleged poaching of TriNet's sales employees. (Doc. # 63 at ¶ 57). Vensure and TriNet are both professional employer organizations ("PEOs") – firms that provide small and mid-sized businesses with "human resources consulting, payroll administration, and other [related] services." (Id. at ¶ 1). "The PEO industry is highly competitive," with various firms often competing to sell their services to the same businesses. (Id. at ¶ 29).

1

Because competition between PEOs "takes place through sales calls and . . . pitches from individual sales employees[,] . . . TriNet devotes substantial time and expense to recruiting, hiring, developing, and training its employees, including . . . its sales force." (Id. at ¶¶ 29-30). Thus, TriNet requires its employees to sign a Proprietary Information and Inventions Agreements ("PIIA") providing that they will not disclose TriNet's confidential information to third parties during or after their employment. (Id. at ¶¶ 33-37). The PIIA defines "confidential information" as "information regarding the skills and compensation of other [TriNet] employees," "lists of current and potential [TriNet] customers," and "employment and recruiting strategies and processes," among other things. (Id. at ¶¶ 35-36).

Additionally, the PIAA requires employees to return TriNet's property and confidential information upon resignation. (Id. at ¶ 37). These confidentiality requirements are also captured by TriNet's various codes of conduct, policies, and handbooks. (Id. at ¶ 38).

The PIIA also contains a "one-year customer and employee non-solicitation covenant[]," providing:

> **5. No Conflicting Employment; Solicitation Restrictions**. While employed by the Company, I will not, without the Company's prior written consent,

> directly or indirectly engage in any employment, consulting, or other activity which creates or is likely to create an actual or a potential conflict of interest with my employment at the Company or conflict with any of my obligations under this Agreement. In addition, during any period in which I am employed by the Company and for a period of one year thereafter, I shall not directly or indirectly, for myself or on behalf of any other person or entity, in any manner or capacity whatsoever, solicit, approach, recruit, interview, offer to hire or attempt to hire, or in any manner endeavor to entice away any person who is employed by or associated with the Company as an employee, independent contractor or agent. Finally, during any period in which I am employed by the Company and for a period of one year thereafter, I shall not directly or indirectly, for myself or on behalf of any other person or entity, whether as an employee, owner, part-owner, shareholder, officer, director, trustee, partner, member, sole proprietor, consultant, agent, representative, or in any other manner or capacity whatsoever, use Company Information to attempt to call on, solicit, or take away any clients or prospects of the Company except on behalf of the Company.

(Id. at ¶ 41; Doc. # 63-1 at 3). And, the PIIA includes the following choice of law clause:

> **Governing Law**. If I am a United States employee, this Agreement will be governed by the laws of the State of California, without regard to conflicts of law principles. If I am a Canadian employee, this Agreement will be governed by the laws of the Province of Ontario and the federal laws of Canada applicable in that Province, without regard to conflicts of law principles.

(Doc. # 63-1 at 5).

Despite the PIIA – of which Vensure was allegedly aware – "Vensure made the intentional decision to target and poach

TriNet employees." (Doc. # 63 at ¶¶ 42-57). Vensure engaged in what it dubbed a "draft," in which it attempted to hire TriNet's "most profitable and valuable" employees. (Id. at ¶ 57). Toward this goal, Vensure "repeatedly sought and obtained [TriNet's confidential] information to identify the [] employees it wanted to 'draft' and poach." (Id. at ¶ 62).

For example, on April 17, 2020, Vensure's Senior Vice President of Recruiting Services Walter Sabrin emailed two former TriNet employees (Kane Pigliavento – now a Vensure Regional Vice President, and Josh McIntosh – now Vensure's National Vice President of Sales) "about a TriNet employee's performance, asking '[w]here does she line up in your draft picks?'" (Id. at ¶¶ 2, 4, 62). On May 6, 2020, Sabrin emailed Pigliavento, McIntosh, and Chad Todora – also a former TriNet employee – asking for "information on a TriNet employee named Joe Ulisano." (Id. at ¶ 64). "Pigliavento responded . . . by providing Sabrin and Vensure with factual [c]onfidential [i]nformation about Ulisano's work and performance at TriNet, including disclosing information relating to the number of deals that Ulisano closed at TriNet." (Id.). The second amended complaint provides other examples of Sabrin requesting information about TriNet employees and former TriNet employees providing allegedly confidential information

4

about those employees' performance. (Id. at ¶¶ 67-70).

The second amended complaint also alleges that "Pigliavento and Sabrin schemed to try and circumvent Pigliavento's non-solicitation agreement by having Sabrin contact and solicit two TriNet employees that Pigliavento identified as good hires for Vensure." (Id. at ¶¶ 74, 78, 84, 86). For instance, on April 30, 2020, Pigliavento emailed Sabrin about two such TriNet employees:

> Not sure if you already have, but can you reach out to Scott Hagen and see if he is open to conversation? Also, check the pulse on David Denison . . . I personally recruited him to TriNet. Super smart and would do well. Just don't know if he would jump.

(Id.). Following this conversation, "Hagen left TriNet and now works for Vensure." (Id. at ¶ 76).

TriNet further alleges that Vensure is and was aware that "some former TriNet employees . . . improperly and unlawfully misappropriated TriNet's [c]onfidential [i]nformation to benefit themselves and Vensure," and that Vensure not only "failed to take adequate or appropriate action to deter or prevent such conduct," but rather "encouraged, induced[,] and rewarded it." (Id. at ¶ 90).

"For example, on February 14, 2020, only four days after Pigliavento informed TriNet that he was resigning,

5

Pigliavento sent a document to his personal Gmail email account [] entitled 'FS Q1 Winboard 2-10.'" (Id. at ¶ 91). This spreadsheet "contained a wealth of TriNet's highly [] confidential and proprietary information, including information about TriNet's financial services industry customers from January 2018 through April 2020." (Id. at ¶ 92). The spreadsheet also "included customer names, customer size, financial data regarding each customer, and information regarding the TriNet employee(s) responsible for soliciting each customer." (Id.). On another occasion, "former TriNet employee Cassandra Anderson also sent a confidential TriNet spreadsheet to her personal email account." (Id. at ¶¶ 99). Despite knowing about this misappropriation, Vensure took no negative action against either Pigliavento or Anderson. (Id. at ¶ 100). To the contrary, Vensure promoted Pigliavento to Regional Vice President. (Id. at ¶ 98).

This suit was originally filed against Pigliavento on August 28, 2020. (Doc. # 1). On December 18, 2020, TriNet amended its complaint to include Vensure as a defendant. (Doc. # 26). TriNet and Pigliavento later settled, contingent upon the Court's entry of a permanent injunction and final judgment against Pigliavento. (Doc. # 48). On January 29, 2021, the Court entered judgment in favor of TriNet and against

6

Pigliavento, with the case remaining open only as to the claims against Vensure. (Doc. # 49). On March 18, 2021, the Court sua sponte dismissed the amended complaint as a shotgun pleading, granting leave to amend. (Doc. # 59).

TriNet filed its second amended complaint on March 25, 2021. (Doc. # 63). The second amended complaint includes the following claims against Vensure: violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count I), tortious interference with contract (Count II), tortious interference with business relationships (Count III), and unfair competition (Count IV). (Id.).

Now, Vensure moves to dismiss the second amended complaint on a number of bases. (Doc. # 65). TriNet has responded (Doc. # 74), and the Motion is ripe for review.

## II. Legal Standard

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of

Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations and citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court must limit its consideration to "well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

III. **Analysis**

In its Motion, Vensure seeks to dismiss the second amended complaint with prejudice, arguing that (1) it remains a shotgun pleading, (2) it is preempted by the Florida Uniform Trade Secrets Act ("FUTSA"), (3) "TriNet fails to state a valid FDUTPA claim," and (4) "TriNet cannot premise its tort claims on a legally void contract." (Doc. # 65 at 1, 9, 13-14, 17). The Court will address each argument in turn.

### A. Shotgun Pleading

First, Vensure argues that the second amended complaint is a shotgun pleading because it is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." (Doc. # 65 at 17 (citation omitted)). TriNet responds that the second amended complaint "contains specific allegations that are tied to each cause of action" and that "because the elements of TriNet's claims materially overlap, it is unsurprising that the same facts support each of TriNet's claims." (Doc. # 74 at 19-20).

"A defendant served with a shotgun complaint should move the district court to dismiss the complaint pursuant to Rule 12(b)(6) or for a more definite statement pursuant to Rule 12(e) on the ground that the complaint provides it with insufficient notice to enable it to file an answer." Paylor v. Hartford Fire Ins. Co., 748 F.3d 1117, 1126-27 (11th Cir. 2014) (footnotes omitted). The Eleventh Circuit has "identified four rough types or categories of shotgun pleadings": (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts"; (2) a complaint that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) a complaint that does "not separat[e]

9

into a different count each cause of action or claim for relief"; and (4) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1322-23 (11th Cir. 2015). "The unifying characteristic of all types of shotgun pleadings is that they fail to . . . give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Id. at 1323.

The Court agrees with TriNet that the second amended complaint does not constitute a shotgun pleading. The second amended complaint clearly lays out the facts of the case and includes separate headings for each cause of action. (Doc. # 63). Although the second amended complaint is more repetitive than necessary at times, the allegations are not so vague or conclusory as to prevent TriNet from formulating a proper response. See Johnson v. EZX, LLC, No. 3:16-cv-1249-PDB, 2017 WL 1386810, at *5 (M.D. Fla. Apr. 18, 2017) ("The amended complaint is not a shotgun pleading. Johnson has separated the counts by defendant and by cause of action, has specified which facts apply to each claim, and has not realleged in each count the allegations in all preceding counts. The

defendants contend they cannot frame a responsive pleading but have identified no desired detail or specific defect other than the purported shotgun nature of the amended complaint and conclusory nature of some allegations. Dismissing the amended complaint . . . is unwarranted."). Accordingly, the Motion is denied as to this requested relief.

### B. Florida Uniform Trade Secrets Act Preemption

Next, Vensure argues that "TriNet's claims involving confidential and/or trade secret information are preempted by FUTSA's broad preemption provision." (Doc. # 65 at 9). TriNet counters that its claims are not preempted by FUTSA because (1) they "are largely based on Vensure causing and inducing former TriNet employees to breach their non-solicitation covenants and contractual confidentiality obligations," (2) they "do not rely on misappropriation of trade secrets," (3) "TriNet has not alleged that Vensure directed TriNet employees to misappropriate . . . confidential information" and (4) "FUTSA preemption does not apply to non-trade secrets." (Doc. # 74 at 8-13).

FUTSA "provides a cause of action for the misappropriation of trade secrets." Sentry Data Sys., Inc. v. CVS Health, 361 F. Supp. 3d 1279, 1293 (S.D. Fla. 2018). The Act defines "misappropriation" as follows:

11

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

1. Used improper means to acquire knowledge of the trade secret; or

2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

a. Derived from or through a person who had utilized improper means to acquire it;

b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2) (2020). The Act further defines a

"trade secret" as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. at § 688.002(4).

FUTSA includes a preemption provision, "displac[ing] conflicting tort, restitutory, and other [Florida] law . . . providing civil remedies for misappropriation of a trade secret." Fla. Stat. § 688.008(1). However, that provision specifically notes that it does not impact "[o]ther civil remedies that are not based upon misappropriation of a trade secret." (Id. at § 688.008(2)(b)). "To determine whether allegations of trade-secret misappropriation preempt a plaintiff from sufficiently pleading a separate, but related tort, the Court must evaluate 'whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred by [Section] 688.008.'" Sentry Data, 361 F. Supp. 3d at 1294 (quoting Allegiance Healthcare Corp. v. Coleman, 232 F. Supp. 2d 1329, 1335-36 (S.D. Fla. 2002)). But, when "there are 'material distinctions between the allegations comprising the additional torts and the allegations supporting the FUTSA claim,' then the additional torts are not preempted." Audiology Distrib., LLC v. Simmons, No. 8:12-cv-2427-JDW-AEP, 2014 WL 7672536, at *9 (M.D. Fla. May 27, 2014) (quoting New Lenox Indus., Inc. v. Fenton, 510 F. Supp. 2d 893, 908 (M.D.

13

Fla. May 3, 2007)).

Here, the second amended complaint does not include a claim for misappropriation of trade secrets under FUTSA. (Doc. # 63). Still, the Court finds that there are material distinctions between TriNet's FDUTPA, tortious interference, and unfair competition claims such that they are not preempted by a possible claim under FUTSA. Indeed, TriNet's FDUTPA, tortious interference, and unfair competition claims rely in part on Vensure's role in "causing, inducing, and/or participating in former TriNet employees breaching their non-solicitation covenants" and the "PIIA's confidentiality terms." (Doc. # 63 at ¶¶ 101, 120, 166, 197-99, 222). Such conduct would not form the basis of a FUTSA claim.

Therefore, TriNet's claims are not preempted by FUTSA and the Court declines to dismiss them for this reason. See B & D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC, No. 16-62364-CIV-COHN/SELTZER, 2017 WL 8751753, at *3 (S.D. Fla. Feb. 10, 2017) ("Material distinctions exist between B&D's FUTSA claims and its FDUTPA and tortious interference claims such that dismissal on the basis of preemption is not warranted[.] . . . B&D's tortious interference and FDUTPA claims are not premised solely on the acquisition of B&D's customer lists. Rather, these claims are

also supported by the creation of UBI to circumvent B&D in distribution and sales of the Product and the direct solicitation of B&D's customers. . . . Therefore, the tortious interference and FDUTPA claims . . . are not preempted."); see also ThinkLite LLC v. TLG Sols., LLC, No. 16-24417-CIV-GRAHAM/SIMONTON, 2017 WL 5972888, at *4 (S.D. Fla. Jan. 31, 2017) ("Even if Defendants used the alleged misappropriated trade secrets to aid her in her solicitations, there are enough material distinctions in the facts alleging wrongdoing that would prevent the Court from exempting Count Eight under Fla. Stat. § 688.08.").

### C. **Florida Deceptive and Unfair Trade Practices Act**

Next, Vensure argues that TriNet "has failed to present sufficient facts to render its [FDUTPA] claim plausible." (Doc. # 65 at 13). Specifically, TriNet has not "allege[d] any injuries to a consumer, only injuries to TriNet." (Id. at 13-14). TriNet responds that it is not required to plead consumer injury, but even assuming such requirement, the second amended complaint alleges that "TriNet is a consumer" that has been injured. (Doc. # 74 at 16-17). And, "TriNet alleges that [c]onfidential [i]nformation about its customers, including 'financial data regarding each customer' was improperly disclosed." (Id. at 17).

15

To state a cause of action under FDUTPA, a plaintiff must sufficiently allege the following elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Kertesz v. Net Transactions, Ltd., 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009) (quoting City First Mortg. Corp. v. Barton, 988 So.2d 82, 86 (Fla. 4th DCA 2008)). "A deceptive practice is one that is likely to mislead consumers, and an unfair practice is one that 'offends established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" Bookworld Trade, Inc. v. Daughters of St. Paul, Inc., 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007). "An unfair practice is one that 'causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.'" Muy v. Int'l Bus. Machs. Corp., No. 4:18-cv-14-MW/CAS, 2019 WL 8161747, at *1 (N.D. Fla. June 5, 2019) (citation omitted); see also Stewart Agency, Inc. v. Arrigo Enters., Inc., 266 So.3d 207, 212 (Fla. 4th DCA 2019) ("While an entity does not have to be a consumer to bring a FDUTPA claim, it still must prove the elements of the claim, including an injury to a consumer.").

Here, TriNet alleges that Vensure violated FDUTPA by:

>     (i) seeking and/or obtaining TriNet's Confidential
>     Information about TriNet's employees and/or
>     customers; (ii) using TriNet's Confidential
>     Information in connection with Vensure's efforts to
>     "draft" and poach TriNet employees as well as to
>     assist Vensure in making workforce decisions; (iii)
>     using improperly poached former TriNet employees to
>     solicit business from TriNet's customers with whom
>     they established goodwill (at TriNet's expense)
>     (iv) upon information and belief, using TriNet's
>     Confidential Information to identify and/or solicit
>     customers; (v) causing, facilitating, inducing,
>     and/or participating in former TriNet employees
>     breaching their non-solicitation covenants because
>     such breaches benefit Vensure; and (vi) causing,
>     facilitating, inducing, and/or participating in
>     former TriNet employees breach of their PIIA's
>     confidentiality terms and TriNet's Security
>     Policies because such breaches benefit Vensure.

(Doc. # 63 at ¶ 101). TriNet contends that this conduct "not only offends established public policy, but is also immoral, unethical, oppressive and/or unscrupulous." (Id. at ¶ 102). And, TriNet was allegedly harmed by this conduct through monetary "losses associated with the funds TriNet incurred in recruiting hiring, and training the now former TriNet employees that Vensure improperly solicited and poached," "lost revenues and profits from merchants who left TriNet to go to Vensure," and "harm to TriNet's goodwill and reputation," among other things. (Id. at ¶ 104).

Vensure argues "TriNet fails to allege any injuries to a consumer, only injuries to TriNet." (Doc. # 65 at 14). Indeed, Count I does not specifically allege injury to a

consumer. (Doc. # 63 at ¶¶ 26-105). However, the second amended complaint does allege that Vensure encouraged and induced former TriNet employees to misappropriate TriNet's confidential customer information. (Id. at ¶ 90). Specifically, Pigliavento sent a company spreadsheet to his personal email account containing "information about TriNet's financial services industry customers from January 2018 through April 2020," including "customer names, customer size, financial data regarding each customer, and information regarding the TriNet employee(s) responsible for soliciting each customer." (Id. at ¶ 92). TriNet contends that this is sufficient to show injury to consumers. (Doc. # 74 at 17-18).

Accepting these allegations as true and making all reasonable inferences in TriNet's favor, the Court finds this just sufficient to allege an injury to consumers. See Burrows v. Purchasing Power, LLC, No. 1:12-cv-22800-UU, 2012 WL 9391827, at *5-6 (S.D. Fla. Oct. 18, 2012) (finding that the defendant's transfer of consumers' personal data constituted an injury under FDUTPA). Accordingly, the Court declines to dismiss Count I for this reason.

### D. **Application of California Law**

Finally, Vensure argues that TriNet's claims for tortious interference with contract, tortious interference

18

with business relationships, and unfair competition fail because they are predicated upon alleged violations of the PIIA, which is governed by California law. (Doc. # 65 at 15). Since California law "prohibits contracts which restrain trade," Vensure contends that the PIIA is void and therefore unenforceable. (Id.). TriNet does not dispute that the PIIA contains such a choice of law clause. (Doc. # 74). However, TriNet counters that "Vensure is not a party to the PIIA and has no right to enforce its choice of law term," "the PIIA's confidentiality covenants . . . are enforceable in California," and even if the PIIA is unenforceable, this would not bar a suit for tortious interference. (Id. at 18-19).

Here, even assuming that Vensure could enforce the PIIA's choice of law clause – despite Vensure not being a party or intended beneficiary to the PIIA – the application of California law to the contract does not prevent TriNet from pursuing its tort claims at this juncture. As the Eleventh Circuit has explained, "under Florida law a plaintiff can maintain a cause of action against a third party for tortious interference in a contract even though he might not be able to enforce the underlying contract." Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc., 485 F.3d 1233, 1243 (11th Cir. 2007). And, contrary to Vensure's

contention, TriNet's tort claims are not based solely on the PIIA's allegedly unenforceable anti-competition clauses. (Doc. # 65 at 14-15). Indeed, TriNet's claims for tortious interference with contract, tortious interference with business relationships, and unfair competition are also predicated on the PIIA's confidentiality clauses. (Doc. # 63 at ¶¶ 113-19, 181-83, 222-23). Vensure does not appear to argue that the confidentiality clauses are unenforceable under California law, nor does it provide any authority stating as much. (Doc. # 65 at 14-16). Therefore, the Court declines to dismiss TriNet's tort claims for these reasons.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Vensure Employer Services, Inc.'s Motion to Dismiss Second Amended Complaint (Doc. # 65) is **DENIED.**

(2) Vensure's answer to the second amended complaint (Doc. # 63) is due by **July 13, 2021.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 29th day of June, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE